IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MYRON D. STUTZMAN, personal representative of the Estate of STEVEN A. MEANS, ET AL., | § § § § | |
| | § | CIVIL ACTION NO. |
| Plaintiffs, | § | |
| | § | 3:06-CV-0300-K |
| V. | § | |
| | § | |
| RAINBOW YACHT ADVENTURES LIMITED, ET AL., | § § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are the following motions:

(1)     Defendant CharterPort BVI's ("CharterPort") Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens (Document No. 21);

(2)     Defendant Rainbow Yacht Adventures Limited's ("Rainbow Yacht") Motion to Dismiss for Lack of Personal Jurisdiction, Insufficient Service of Process, and Improper Venue (Document No. 33);

(3)     Plaintiffs Myron Stutzman, personal representative of the Estate of Steven A. Means, Decedent, on behalf of the Estate of Steven A. Means and for the benefit of the Decedent's Wife, Children and Mother and Susan Lancaster Means, Courtney Laurence Means, Chandler Sinclaire Means and Lottie Hester Means' (collectively "Plaintiffs") Motion for Leave to Take the Deposition of Rainbow Yacht (Document No. 43);

(4)     Defendant Southern Trades Yacht Sales' ("Southern Sales") Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens (Document 52);

(5)     Plaintiffs' Motion for Leave to File Sur-Reply in Response to Rainbow Yacht's Motion to Dismiss for Improper Venue (Document No. 57); and

(6)     Plaintiffs' Motion to Enlarge Time (Document No. 67).

The Court **GRANTS** Plaintiffs' Motion for Leave to File Sur-Reply; therefore, the attached Sur-Reply is deemed filed as of this date.  Defendants CharterPort, Rainbow Yacht, and Southern Sales (collectively "Defendants") lack sufficient minimum contacts with the forum and the United States, as a whole, for the Court to assert general or specific personal jurisdiction over them.  The Court, therefore, **GRANTS** Defendants' motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) ("Rule 12(b)(2)").  Accordingly, all claims against Defendants are dismissed without prejudice. *Guidry v. U.S. Tobacco Co., Inc.,* 188 F.3d 619, 623 (5th Cir. 1999).  Plaintiffs' Motions for Leave to Take the Deposition of Rainbow Yacht and to Enlarge Time are **DENIED** as moot.  Service has not been made on Defendant Southern Trades Yacht Charters ("Southern Charters"); therefore, pursuant to the Court's Order of December 4, 2006,  this case is hereby **DISMISSED** without prejudice as to Southern Charters.  See Fed. R. Civ. P. 4(c)(1), 4(m).

I.     **Factual Background**

In January 2005, Steven and Susan Means (the "Means") made reservations

through All-Aboard Travel, a Texas travel agency, to charter the Arabesque for a sailing and scuba diving trip in the British Virgin Islands (the "BVI").  On January 16, 2006, the Means boarded the Arabesque in the BVI which was captained by Matthew Rose-Innes ("Captain Rose").  Three days later on January 19, 2006, Captain Rose and his brother, Clint Christopher, organized a scuba dive for the Means.  During the dive, Susan Means experienced complications with her scuba equipment.  After being unable to locate Captain Rose at the dive site, Mr. and Mrs. Means surfaced without his assistance.  Upon reaching the surface, Susan Means managed to board the Arabesque's dinghy; however, Steven Means drowned while trying to board.

After the accident, Plaintiffs filed this suit for wrongful death of Steven Means against Defendants the Arabesque, a sailing vessel, Rainbow Yacht, CharterPort, Southern Charters, Southern Sales, and Tom Collins Yachts Worldwide, Inc. ("Collins Yachts") as set forth in their Amended Complaint.  Plaintiffs subsequently dismissed defendants the Arabesque and Collins Yachts from the case.  The remaining Defendants are foreign nonresidents. Plaintiffs contend that Defendants were engaged in a joint enterprise to promote, lease, manage, charter, and operate the Arabesque.  Plaintiffs claim, among other things, that Defendants acted negligently under the Death on the High Seas Act ("DOHSA") and misrepresented the capabilities and quality of the Arabesque.  46 U.S.C. § 761.  Therefore, Plaintiffs argue that Defendants are jointly and severally liable for Steven Means's death.

## II.    Personal Jurisdiction Legal Standard

Plaintiffs bear the burden of establishing personal jurisdiction over each Defendant.  *Gundle Lining Constr. v. Adams Cty. Asphalt, Inc.,* 85 F.3d 201, (5th Cir. 2004).  A federal district court may exercise personal jurisdiction over nonresidents if (1) the forum's long-arm statute confers personal jurisdiction over the defendants, and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment in the United States Constitution.  *Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 343 (5th Cir. 2004).  Texas's long-arm statute extends the exercise of jurisdiction to the full limits allowed by the Due Process Clause of the Fourteenth Amendment.  *Id.*  Therefore, in order for this Court to properly exercise jurisdiction over nonresident defendants, the Court must comply with the Due Process Clause which requires: (1) the nonresident defendant must have minimum contacts with the forum state and (2) subjecting the nonresident defendant to the jurisdiction must be consistent with the traditional notions of fair play and substantial justice.  *Id.*  The unilateral activity of third parties or those who claim a relationship with the nonresident defendant does not satisfy the minimum contacts requirement. *Helicopteros Nationales De Columbia v. Hall,* 466 U.S. 408, 417 (1984).  Accordingly, the nonresident defendant's contacts with this forum must be such that the nonresident defendant reasonably anticipates being haled into court here.  *Growden v. Ed Bowlin & Assoc.,* 733 F.2d 1149, 1151 (5th Cir. 1984).  Sufficient minimum contacts may give rise to general or specific jurisdiction, and each defendant's contacts must be analyzed

separately.  *Id.; Rush v. Sauchuck,* 444 U.S. 320, 331 (1980).

A court may exercise general jurisdiction when the nonresident defendant's contacts with the forum state, although not related to the present litigation, are substantial, continuous and systematic. *Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208, 217 (5th Cir. 2000)(citing *Helicopteros,* 466 U.S. at 414).  For the Court to maintain general jurisdiction over Defendants, due process requires minimum contacts of a more extensive nature and quality than those required to establish specific jurisdiction.  The "continuous and systematic" test is difficult to satisfy.  *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.,* 249 F.3d 413, 419 (5th Cir. 2001)(noting the Supreme Court has only once upheld personal jurisdiction where the suit was unrelated to the defendant's contacts with the forum).

When determining whether it has specific jurisdiction over a defendant, the Court considers the relationship between the defendant, the forum and the litigation. *Freudensprung,* 379 F.3d at 343.  The Court may exercise specific jurisdiction over Defendants if they (1) purposefully directed their activities toward this state or purposefully availed themselves of the privileges of conducting activities here; and (2) the controversy arises out of or is related to Defendants' contacts with this state.  *Id.*

Even if the Court finds that Defendants have sufficient contacts with the forum, exercising personal jurisdiction over nonresident defendants must not offend traditional notions of fair play and substantial justice. *Stuart v. Spademan,* 772 F.2d 1185, 1192-93 (5th Cir. 1985).  To make this determination, the Court considers the burden on the

defendant, the plaintiff's interest in obtaining relief, and the interests of the several states. *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 377 (5th Cir. 1987).

Under Federal Rule of Civil Procedure 4(k)(2) ("Rule 4(k)(2)"), the Court also has personal jurisdiction over foreign defendants for claims arising under federal law if the defendants have sufficient contacts with the United States, as a whole, but do not have sufficient contacts to satisfy the due process concerns of any state's long-arm statute. *World Tanker Carriers Corp. v. M/V Ya Mawlaya,* 99 F.3d 717, 720 (5th Cir. 1996). Claims within admiralty jurisdiction, like the claims in this case, are claims arising under federal law for the purposes Rule 4(k)(2). *Submersible Systems,* 249 F.3d at 419. Rule 4(k)(2) requires the same "minimum contacts" analysis, but applied to the nation as a whole rather than merely the forum state. *Id.* Thus, Plaintiffs still maintain the burden under Rule 4(k)(2) to establish (1) Defendants' contacts with the United States are continuous and systematic (for general jurisdiction) or gave rise to this cause of action (for specific jurisdiction) and (2) exercising jurisdiction comports with the traditional notions of fair play and substantial justice. Courts generally consider three factors when determining the sufficiency of minimum contacts for general jurisdiction under Rule 4(k)(2) such as: (1) transacting business in the United States; (2) doing an act in the United States; or (3) having an effect in the United States by an action done elsewhere. *See Saudi,* 159 F. Supp. 2d at 480; *Norvel Ltd. v. Ulstein Propeller AS,* 161 F. Supp. 2d 190, 206 (S.D.N.Y. 2001). Defendants contacts with the forum are insufficient to exercise general or specific personal jurisdiction.

- 6 -

**III.    CharterPort's Motion to Dismiss for Lack of Personal Jurisdiction**

CharterPort is a corporation organized and existing under the laws of the BVI with its principal place of business located in Road Town, Tortola, BVI.  CharterPort acts as a calendar keeper, information disseminator, and escrow agent for approximately 80 crewed charter yachts, including the Arabesque.  It provides information to charter brokers concerning the availability of the yachts and holds payment for the chartered boats through its escrow services.  In addition, it provides mail and phone services to the yacht and their crew.

CharterPort advertises its business to charter brokers through its company website and advertisements placed in publications such as Yachting Magazine. In addition, CharterPort sends employees to annual boat shows in the U.S. Virgin Islands "in order to support the boats they provide services to."  To facilitate business, CharterPort maintains two toll free international telephone numbers which are available for use in the United States and it uses a United States post office box address in St. John in the United States Virgin Islands.

In essence, CharterPort does business with charter brokers.  For example, prospective charterers, like the Means, contact travel agencies, such as All-Aboard, to charter a yacht.  Travel agencies in turn contact charter brokers, like Collins Yachts. Charter brokers then contact CharterPort to determine the availability and price of yachts represented by CharterPort.  If a yacht represented by CharterPort is available, the yacht broker will place a hold on a particular yacht by placing a charterer's deposit

in an escrow account controlled by CharterPort.

A.    **General Personal Jurisdiction over CharterPort**

The Court finds it lacks sufficient minimum contacts with Texas for this Court to maintain general personal jurisdiction.  Similarly, CharterPort lacks sufficient contacts with the United States, as a whole, to assert general personal jurisdiction under Rule 4(k)(2).

In their Response, Plaintiffs argue that the Court has general personal jurisdiction over CharterPort under Rule 4(k)(2).   In their attempt to prove CharterPort has continuous and systematic contacts with the United States, as a whole, Plaintiffs list several contacts which are insufficient, even when viewed together, to establish general personal jurisdiction over CharterPort.

First, Plaintiffs argue that the Court has jurisdiction because CharterPort, which was not incorporated at the time of the accident, was being operated by Robert Carson, a United States expatriate, as a sole proprietorship.   Plaintiffs however cite no legal authority to show how this establishes a "contact" or jurisdiction with the United States. In fact, as Plaintiffs note, Robert Carson ("Carson") has not lived in the United States since 1992.

To establish general jurisdiction, Plaintiffs also argue that 70% to 75% of CharterPort's business is conducted with independent charter brokers located in the United States on a daily basis.  To do business with CharterPort, charter brokers located in the United States initiate contact with CharterPort.  Such unilateral activity can not

- 8 -

form the basis for personal jurisdiction even if a substantial portion of CharterPort's business derives from the United States.  *Helicopteros,* 466 U.S. at 417 (finding no personal jurisdiction in a wrongful death suit where nonresident defendant purchased 80% of its fleet from a company located in the forum, negotiated the contract in the forum, and sent pilots to the forum for training).  A nonresident defendant's contacts are sufficient to confer general jurisdiction only when they result from actions by the defendant himself such that the contacts create a substantial connection with the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475(1985)("jurisdiction...is proper where the contacts properly result from actions by the defendant *himself* that create a 'substantial connection' with the forum state"(emphasis in original)).

Plaintiffs contend that funds paid by United States charterers through their travel agents or their charter brokers to escrow accounts maintained by CharterPort in the BVI provides proof of sufficient continuous and systematic contacts.  These funds are deposited in this escrow account as consideration for the underlying charter agreement between the charterers and the yacht owners.  CharterPort is not a party to the underlying charter agreements, and even if it were, merely contracting with a charter broker located in United States is insufficient to subject CharterPort to the Court's jurisdiction.  *Freudensprung,* 379 F.3d at 344; *Holt Oil & Gas Corp v. Fywin Investments, Pty. Ltd.,* 801 F.2d 773, 778 (5th Cir. 1986).  In fact, the underlying charter agreements are performable in the BVI not the United States.  *Jones v. Petty-Ray Geophysical Geosource, Inc.,* 954 F.2d 1061, 1068 (5th Cir. 1992)(place of contractual performance determines

whether the making of the contract is sufficiently purposeful to satisfy minimum contacts).  Funds sent from the United States in consideration for contracts which are performable outside the United States actually decreases the likelihood such agreements constitute purposeful availment.  *G&H Partners, Ltd., v. Boer Goats Int'l Ltd.,* 896 F. Supp. 660, 665 (W.D. Tex. 1995).

Plaintiffs further contend that CharterPort's use of a United States post office box in St. John constitutes purposeful availment.  Plaintiffs cite no legal authority in support of this argument.  CharterPort's use of the United States postal system does not support finding the continuous and systematic contacts necessary to establish personal jurisdiction.  *Galapagos Corporacion Turistica "Galatours", S.A. v. The Panama Canal Commission,* 2002 WL 389143 (E.D. La. March 8, 2002)(holding that nonresident defendant lacked requisite continuous and systematic contacts under Rule 4(k)(2) where nonresident defendant maintained an agent in Florida, solicited business in the United States, purchased parts in the United States, and availed itself of the U.S. postal and banking systems).

Despite Plaintiffs' argument to the contrary, CharterPort's toll free phone numbers available for use in the United States do not establish continuous and systematic contacts necessary to maintain personal jurisdiction.  *Mink v. AAA Dev. LLC,* 190 F.3d 333, 337-38 (5th Cir. 1999)(holding passive website that posted defendant's toll-free number along with information about products, printable mail-in forms, mailing address, and email address insufficient to establish general jurisdiction).  It is also

important to note that CharterPort contracts with Cable & Wireless, a British Company, for use of the phone numbers.  Similarly, Plaintiffs rely on CharterPort's daily telephone calls with United States charter brokers in an attempt to show continuous and systematic contacts.  Although CharterPort does return phone calls to the United States, telephone calls are originally generated from the United States by charter brokers to determine the availability of the yachts represented by CharterPort.  The unilateral activity of United States charter brokers initiating calls to CharterPort does not support the exercise of general jurisdiction.  *Helicopteros*, 466 U.S. at 416-17.  The fact that CharterPort returns roughly "two calls to the United States a day" falls far short of the contacts constitutionally required to support general jurisdiction.  *See Galatours,* 2002 WL at *4 (holding Defendant who had an agent in Florida and solicited business in the United States fell far short of the systematic and continuous contacts constitutionally required).  Likewise, the fact that these calls may include negotiating charter agreements on behalf of yacht owners does not support finding contacts sufficient to confer jurisdiction over CharterPort. *Holt Oil,* 801 F.2d at 778 (exchange of communication in the course of developing a contract is insufficient to constitute purposeful availment); *See also Revell v. Lidov,* 317 F.3d 467, 471 (5th Cir. 2002).  In fact, any contract formed by exchanging communications between a charterer and CharterPort's yacht clients is performable in the BVI, not the United States.  Forming a contract that is performable outside this forum on behalf of another does not constitute purposeful availment. *Jones,* 954 F.2d at 1068.

- 11 -

Plaintiffs also rely on the fact that CharterPort sends employees to a boat show in the USVI every year to support the exercise of general jurisdiction. Sending employees to an annual boat show hardly constitutes continuous and systematic contacts necessary to establish personal jurisdiction over CharterPort. *Submersible Sys.,* 249 F.3d at 420-21 (holding that sending employees every year to a conference in Houston, together with construction of a drilling rig in Mississippi, maintaining a bank account in Houston, and purchasing parts and vessels in the United States insufficient to establish general jurisdiction over foreign entity under Rule 4(k)(2)).

Passively advertising through a website and a magazine do not sufficiently establish the requisite continuous and systematic contacts. CharterPort conducts no business through its website. Because CharterPort website is entirely passive, its website can not form the basis of general jurisdiction. *Mink,* 190 F.3d at 337; *see also Quick Technologies, Inc. v. Sage Holdings, Inc.,* 313 F.3d 338, 345 (5th Cir. 2002)(operating a website containing company and product information and links to U.S. subsidiaries does not provide sufficient grounds for the exercise of personal jurisdiction). Likewise, placing advertisements in publications such as the Yachting Magazine is insufficient to establish jurisdiction. *Quick Technologies,* 313 F.3d at 345.

The Court lacks general jurisdiction over CharterPort because CharterPort lacks continuous and systematic contacts with Texas and the United States, as a whole.

- CharterPort is a foreign entity with its principal place of business in the BVI; it does not even maintain an office in the United States.

- Other than this case, CharterPort has never sued or been sued in the United States.

- CharterPort has no agents, employees, or other representatives in Texas or in any other state.

- Other than attending annual boat shows in the USVI, no employees have ever traveled to the United States to conduct business on its behalf.

- It is not required to maintain and does not maintain a registered agent for service in Texas or the United States.

- CharterPort has never owned or leased property in any state in the United States, and it has never paid nor been required to pay income or property taxes in Texas or any other state in the United States.

- CharterPort maintains no bank accounts in Texas or the United States.

- It is undisputed that the material events giving rise to this cause of action occurred in the BVI, a location outside this forum.

In light of well established case law, Plaintiffs list of CharterPort's contacts with the forum, even when considered collectively, are not continuous and systematic such that they create a substantial connection to Texas or the United States. *Burger King,* 471 U.S. at 475. Therefore, the Court may not exercise general jurisdiction over CharterPort. *Id.*

## B.   Specific Personal Jurisdiction over CharterPort

When determining whether it has specific jurisdiction over CharterPort, the Court considers the relationship between CharterPort, the forum and the litigation. *Id.* Plaintiffs claims of specific jurisdiction, therefore, are limited to its involvement in the Means' charter. The Court finds that CharterPort's alleged contacts with Texas are

- 13 -

insufficient to confer specific jurisdiction.  Similarly, its contacts with the United States, as a whole, are insufficient to establish specific jurisdiction under Rule 4(k)(2).

Plaintiffs assert three bases for specific jurisdiction over CharterPort:

- CharterPort communicated with Collins Yacht, a Florida charter broker that booked the Means' charter;

- Steven Means executed a document authorizing CharterPort to charge his credit card for the charter fee; and

- CharterPort was involved in a joint venture with Collins Yachts and the other Defendants to charter the Arabesque for Mr. and Mrs. Means.

CharterPort's contacts with Texas and the United States relating to this cause of action were tenuous and the result of the unilateral activity of Mr. and Mrs. Means.

Plaintiffs contend that the Court has specific jurisdiction over CharterPort because "CharterPort's actions ensured that Steven and Susan Means would charter the Arabesque."  Plaintiffs attempt to connect CharterPort, through attenuated contractual ties, to their tort claims in a vain effort to establish specific jurisdiction.  In this case, CharterPort was not even a party to the underlying charter agreement.  To that end, CharterPort never communicated with Steven Means or Plaintiffs during the booking of the charter.  To book the charter, Plaintiffs contacted All-Aboard, who in turn contacted Collins Yachts, who in turn contacted CharterPort.  CharterPort was merely an intermediary used to facilitate the transaction by providing escrow and calendaring services.  Because CharterPort was not a party to the underlying agreement and only an

intermediary twice removed from any contact with Mr. or Mrs. Means, the underlying charter agreement may not serve as a basis to hale CharterPort into this forum or in any forum in the United States. *Burger King,* 471 U.S. at 475. CharterPort did not solicit Collins Yachts, All-Aboard or Mr. and Mrs. Means to book the Arabesque. The unilateral activity of Mr. and Mrs. Means, Plaintiffs, All-Aboard, and Collins Yachts cannot form the basis of specific jurisdiction over CharterPort. *Id.*

Just as Plaintiffs have relied on contractual ties with Collins Yachts and All-Aboard to establish specific jurisdiction over CharterPort, Plaintiffs argue that CharterPort was part of a "joint enterprise" with Collins Yachts and Defendants in an attempt to establish specific jurisdiction. Personal jurisdiction cannot be based upon contacts by another member of a joint enterprise. *Nocando Mem Holdings, Ltd. v. Credit Commercial de France, S.A.,* 2004 WL 2603739 *13; *see also Thomas v. Lazard Freres & Co., L.L.C.,* 2002 WL 1461915 *3 (N.D. Tex. May 21, 2002).

To establish specific jurisdiction, Plaintiffs contend that CharterPort provided Collins Yachts with blank credit card authorization forms knowing that  Collins Yachts would in turn provide the forms to charterers, like the Means, who desired to pay requisite charter-reservation deposits by credit card. Plaintiffs assert that *but for* the authorization Steven Means' wrongful death would not have occurred. The Court finds this argument without merit. The Court notes that the underlying charter agreement formed the relationship between the parties, not the credit card authorization. The contact between CharterPort, the authorization form, and the Means is attenuated and

tenuous at best.  At the time the credit card authorization form was provided to Collins

Yachts, CharterPort did not even know where Steven Means resided.  CharterPort

merely provides blank credit card authorization forms to its charter brokers so that

charterers have the option to pay by credit card.  Steven Means could have paid his

charter-reservation deposit by any form of payment, but he himself chose to pay his

charter-reservation deposit by credit card.  Such unilateral activity on behalf of Mr.

Means cannot support the basis of specific jurisdiction over CharterPort.  *Burger King,*

471 U.S. at 475.  In fact, the money charged from Mr. Means' credit card was deposited

into in an escrow account for the benefit of the Arabesque, not CharterPort.  Because

(1) the authorization form does not create a contractual relationship between the parties,

(2) Mr. Means himself chose to execute the form, and (3) the funds were for the benefit

of the Arabesque, not CharterPort, any contact derived from the authorization form is

attenuated and can not support the exercise of general jurisdiction.  *Id.*

The underlying accident which gave rise to this suit occurred in the territorial

waters of the British Virgin Islands, a territory of the United Kingdom, on a boat docked

and boarded by Plaintiffs in that territory.  CharterPort's alleged negligence, if any,

relating to owning, managing, or operating the Arabesque occurred outside this forum

in the British Virgin Islands.  Plaintiffs' cause of action did not arise out of nor is directly

related to CharterPort's contacts with Texas or the United States.  *Submersible Systems,*

49 F.3d at 420 (holding the case did not "arise out of" the defendant's contacts with the

United States because all the events giving rise to plaintiff's conversion claim occurred

in Mexico).  Because the Means booked their trip through All-Board and Collins Yachts, any contact with Texas (or the United States for that matter) is at least twice removed and too tenuous to support the exercise of specific personal jurisdiction.  During the booking process, CharterPort never even communicated with the Means or Plaintiffs. The Court concludes that CharterPort lacks sufficient minimum contacts with Plaintiffs because it did not (1) purposefully direct its activities toward this forum or the United States nor did it purposefully avail itself of the privileges of conducting business here or in the United States; and (2) the controversy does not arise out of nor is related to CharterPort's contacts with Texas or the United States.  *Id.*  The Court, therefore, may not exercise specific jurisdiction over CharterPort.

## IV.    Rainbow Yacht's Motion to Dismiss for Lack of Personal Jurisdiction

Rainbow Yacht is a Limited Liability Corporation incorporated and existing under the laws of the BVI.  Its corporate and registered office is located in Road Town, Tortola, BVI which is maintained by Trident Trust of the BVI.  Rainbow Yacht's business is chartering the Arabesque, a yacht which is its primary asset.  To operate its chartering business, Rainbow Yacht leases docking space exclusively in the BVI.  For example, Rainbow Yacht leases space from Village Cay Marina in the BVI to dock the Arabesque.  In fact, Rainbow Yacht has never contracted to dock at any port in the USVI or any other part of the United States to board or discharge guests.  All of Rainbow Yacht's personal property not being used aboard the Arabesque is kept in a leased storage unit in Tortola, BVI.  Rainbow Yacht's primary mailing address is Post

- 17 -

Office Box 3252 Road Town, Tortola, BVI, and it pays CharterPort, its agent, to receive and store its mail.  Rainbow Yacht's bank account and credit card accounts are located in the BVI.  From these accounts, it pays expenses related to the maintenance, operation and chartering of the Arabesque.  Repair and maintenance of the Arabesque is performed exclusively in the BVI.

Rainbow Yacht advertises the Arabesque by maintaining a worldwide website and by providing brochures to its brokers.  If potential charterers contact Rainbow Yacht directly, they are referred to a charter broker.  Reservations to charter the Arabesque are made by charter brokers through Rainbow Yacht's agent, CharterPort.

## A.    General Personal Jurisdiction over Rainbow Yacht

The Court finds Rainbow Yacht's contacts with this forum and the United States, as a whole, are merely tenuous, insignificant and sporadic.  Such contacts are insufficient to establish general jurisdiction over Rainbow Yacht.

In their Response, Plaintiffs argue that the Court has general personal jurisdiction over Rainbow Yacht under Rule 4(k)(2).  Thus, Plaintiffs contend that Rainbow Yacht has "continuous and systematic" contacts with the United States, as a whole.  Plaintiffs first rely on the fact that United States residents, like the Means, often contract with Rainbow Yacht to charter the Arabesque.  Plaintiffs point to the fact that these contracts are "likely formulated in the United States by charter brokers."  However, contracting with a Texas or United States resident is insufficient to establish personal jurisdiction over a foreign nonresident defendant such as Rainbow Yacht.  *Freudensprung,* 379 F.3d

at 344; *R&B Falcon Drilling (Intl. Deepwater), Inc. v. Noble Denton Group,* 91 Fed. Appx. 317, 320-21 (5th Cir. 2004). This is particularly true in this case where the charter agreements were generally performable in the BVI. *Jones,* 954 F.2d at 1068 (5th Cir. 1992).

Plaintiffs argue that "many" of the charter agreements involve at least partial performance in the United States. It is true that prior to 2005, Rainbow Yacht sometimes accommodated charterers by allowing them to board and be released in the USVI. Rainbow Yacht permitted charterers to board the Arabesque in the USVI only eight times, and even then, the charter destinations were in the BVI. *Carter v. LaGloria Shipping,* 1997 WL 423101 *1-2 (E.D. La. Jul. 24, 1997)(holding defendant's lacked sufficient contacts with the United States to support personal jurisdiction under Rule 4(k)(2) where defendant's vessels traveled to Louisiana ports on fifteen occasions because defendant did not purposefully direct its activity toward United States when charterers selected destination). Rainbow Yacht did not contract to dock at any port in the USVI; therefore, the Arabesque would transport these guests in a small dinghy from land to an offshore mooring. Due to the time consuming process of checking into and out of the USVI and BVI customs and immigration, Rainbow Yacht now requires all charters to begin and end in the BVI. Since the Spring of 2005, the Arabesque has sailed exclusively in the waters of the BVI. The Court finds that traveling to the USVI only eight times to accommodate guests' boarding needs without ever contracting to dock in the USVI does not constitute "continuous and systematic" contacts with the

"nation as a whole" to give rise to personal jurisdiction under Rule 4(k)(2). *Carter,* 1997 WL 423101 at *1-2.

Plaintiffs contend that the fact Rainbow Yacht's majority shareholder and controlling officer, Stephen Radcliffe, lives in the United States supports the exercise of general jurisdiction. Again, Plaintiffs fail to cite any authority showing how this is relevant in establishing jurisdiction over Rainbow Yacht. In fact, neither the residency nor the citizenship of a controlling shareholder will establish personal jurisdiction over the company. *American Eyewear, Inc. v. Peepers' Sunglasses & Accessories, Inc.,* 106 F.2d 895, 899 (N.D. Tex. 2000)(citing *Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208, 219 (5th Cir. 2000)). The focus of the jurisdictional inquiry is on the company not the controlling shareholder. As set forth above, Rainbow Yacht's primary business–chartering the Arabesque–is performed almost exclusively in the BVI. The captain of the Arabesque lives in the BVI and manages the day-to-day operations of Rainbow Yacht. Radcliffe's role in chartering the Arabesque is limited to long-term planning and capital expenditure decisions. For example, the captain, not Radcliffe, schedules the charters through Rainbow Yacht's agent, CharterPort. Once the Arabesque is booked, the captain makes the necessary preparations for each charter including planning the trip, purchasing provisions, and preparing the vessel for sailing. The captain also performs the bookkeeping and accounting functions in the BVI. Therefore, Radcliffe's status as a United Status resident has no relevance in determining whether Rainbow Yacht has purposefully availed itself of the benefits of conducting

business in the United States.

Without citing legal support, Plaintiffs argue that Rainbow Yacht's relationship with United States charter brokers supports finding general jurisdiction. Particularly, Plaintiffs focus on the fact that allegedly Rainbow Yacht's "premier" broker is located in Maine and that Rainbow Yacht provides these brokers with brochures advertising the Arabesque. Neither Rainbow Yacht nor its agent, CharterPort, actively seeks customers to charter the Arabesque. Rather, charter brokers located in the United States act as an intermediary advertising many yachts. For example, when a charter broker finds a customer willing to charter the Arabesque, they contact CharterPort to schedule the charter. The charter brokers receive a commission charged against the total fee paid by the charterer. Rainbow Yacht does not communicate regularly with charter brokers; in fact with few exceptions, Rainbow Yacht communicates with charter brokers only once a year at an annual boat show in the BVI. At that event, Rainbow Yacht displays the Arabesque, along side many other BVI yachts, and distributes brochures to brokers. Rainbow Yacht has no contractual relationship with any United States charter broker; thus, Rainbow Yacht has no control over the charter brokers. The Court finds that Rainbow Yacht does not purposefully avail itself of the benefits of conducting business in the United States by merely communicating with charter brokers at an annual boat show located in the BVI; therefore, Rainbow Yacht's non-contractual relationship with charter brokers is insufficient to support general jurisdiction under Rule 4(k)(2).

Plaintiffs assert that Rainbow Yacht's website supports finding general

jurisdiction.  As stated in Section III of this order, a website that provides product information, toll-free telephone numbers, email addresses, mail addresses, and mail-in order forms does not support the exercise of personal jurisdiction.  *Mink,* 190 F.3d at 337; *Quick Technologies,* 313 F.3d at 345.  Rainbow Yacht's website does little more than advertise the Arabesque through which visitors may send an email.  Thus, Rainbow Yacht's website is nothing more than a "passive advertisement" and does not support finding general personal jurisdiction.  *Mink,* 190 F.3d at 337; *Quick Technologies,* 313 F.3d at 345.

Plaintiffs also argue that the fact Robert Carson, the owner of CharterPort, is an American supports finding jurisdiction over Rainbow Yacht.  The jurisdiction inquiry is on Rainbow Yacht's purposeful contacts with the United States, as a whole, not on Rainbow Yacht's agent's owner.  CharterPort schedules charters and acts as an escrow agent for Rainbow Yacht.  As stated in Section III of this Order, CharterPort lacks sufficient minimum contacts with the United States, as a whole, for this Court to exercise specific and general jurisdiction.  Carson has lived and conducted the business of CharterPort in the BVI since Rainbow Yacht formed its relationship with CharterPort. The Court finds this relationship in no way evidences Rainbow Yacht's purposeful contacts with the United States as a whole.

The Court concludes that Rainbow Yacht lacks sufficient minimum contacts with Texas and the United States to exercise general jurisdiction.

• Rainbow Yacht is a BVI company in business to charter the Arabesque to

destinations throughout the BVI.

- It is a foreign entity with its principal place of business in the BVI.

- Rainbow Yacht does not own or lease any real property in the United States, and it does not maintain a bank or credit card account in the USVI or the United States.

- Rainbow Yacht has no mailing address in the United States.

- All repair and maintenance work on the Arabesque is performed in the BVI, not the USVI or the United States.

- The Arabesque has never reached the continental United States while under the ownership of Rainbow Yacht.

- Any contact with the United States is the result of the unilateral activity of potential charterers and charter brokers.

- The charter agreements between Rainbow Yacht and charterers, like the Means, are performable in the BVI.

- The events giving rise to this cause of action occurred in the BVI.

Even when Plaintiffs' list of contacts are considered collectively, they are insufficient to establish general jurisdiction over Rainbow Yacht.  Because Plaintiffs have failed to prove that Rainbow Yacht's contacts with Texas and the United States, as a whole, are continuous and systematic, the Court lacks general jurisdiction over Rainbow Yacht.

**B.      Specific Personal Jurisdiction over Rainbow Yacht**

Rainbow Yacht has not directed activities toward this forum  and the controversy did not arise out of nor is it related to Rainbow Yacht's contacts with the forum.  The Court may not exercise specific jurisdiction over Rainbow Yacht under the traditional

and Rule 4(k)(2) minimum contact analysis.

Plaintiffs rely on the fact that the Means were in Texas when they booked the charter, executed the charter agreement and paid the funds to charter the Arabesque. As stated above, such unilateral activity does not support finding personal jurisdiction. *Burger King,* 471 U.S. at 475. The actual charter of the Arabesque–the performance of the agreement–occurred entirely in the BVI. The Means boarded the Arabesque in the BVI and the accident occurred in the territorial waters of the BVI, a territory of the United Kingdom. Plaintiff's causes of action relate to alleged acts and omissions which occurred in the BVI.

Plaintiffs contend the traditional standards of specific jurisdiction are not applicable in this case because every suit brought under the DOHSA involves a tort that occurred beyond the territorial waters of any state. Plaintiffs argue that the entire purpose of the DOHSA would be defeated if a district court lacked jurisdiction because the tort occurred outside the state in which that district court sits. Plaintiffs, however, cite no case law in support of this argument. In fact, federal courts apply a minimum contacts analysis to determine whether the exercise of personal jurisdiction is proper in DOHSA and other admiralty cases. *See Freudensprung,* 379 F.3d at 342; *Holt v. Klosters Rederi A/S*, 355 F. Supp. 354 (W.D. Mich. 1973); *Ying Shiue Jyu Fen v. Sanko Kisen,* 441 F. Supp. 45 (S.D.N.Y. 1977).

Rainbow Yacht has not purposefully directed activity toward this forum or the United States. Plaintiffs have relied on the unilateral activity of the Means in attempt

to establish personal jurisdiction.  Because the events giving rise to this cause of action occurred in the BVI, Plaintiffs' claims did not arise out of or relate to Rainbow Yacht's contacts with this forum or the United States.  *Submersible Systems,* 49 F.3d at 420.  The Court may not exercise specific jurisdiction over Plaintiffs.

## V.   Southern Sales Motion to Dismiss for Lack of Personal Jurisdiction

Since 1997, Southern Sales has been a company organized under the laws of the BVI with its principal place of business in Road Town, Tortola, BVI.  Like CharterPort, Southern Sales is also operated by Carson.  Southern Sales is in the business of brokering sales and managing the financial affairs of yachts.  Southern Sales financial management services include balancing accounts, collecting invoices and paying bills. All yachts under its management are located in the BVI.  In 2002, Southern Sales acted as the broker for the sale of the Arabesque to Rainbow Yacht.  After the sale, Southern Sales managed the Arabesque's finances until May or June 2003.  While managing the vessel, Southern Sales did purchase supplies for the vessel at the direction of the crew.

In their response, Plaintiffs do not argue Southern Sales is subject to specific jurisdiction in this forum.  Rather, Plaintiffs argue that Southern Sales is subject to general jurisdiction under Rule 4(k)(2).  The Court will focus its inquiry on the exercise of general jurisdiction over Southern Sales.  The Court lacks specific jurisdiction over Southern Sales because the accident which gave rise to this cause of action occurred in the BVI, and did not arise out of Southern Sales contacts with Texas or the United States.

- 25 -

To exercise general jurisdiction over Southern Sales, Plaintiffs must prove that Southern Sales has "continuous and systematic" contacts with Texas, or alternatively, under Rule 4(k)(2), Plaintiffs must prove that Southern Sales has continuous and systematic contacts with the United States, as a whole.  The continuous and systematic test is difficult to meet.  *Submersible Systems,* 249 F.3d at 419.  In their response, Plaintiffs list six "contacts" in an attempt to establish general jurisdiction over Southern Sales under Rule 4(k)(2).  Even when viewed collectively, the listed contacts are not sufficient to establish general jurisdiction over Southern Sales.

In their effort to establish general jurisdiction, Plaintiffs first argue that Southern Sales held itself out as having an office located in the USVI.  Plaintiffs fail to cite any legal authority showing how this fact establishes general jurisdiction.  By oversight, Southern Sales did list a USVI office location on its website, but it has not had an office in the United States for almost ten years.  In fact, its only office is located in the BVI.  The fact that Southern Sales listed a United States office location on its website is not sufficient to establish general jurisdiction even when viewed in light of Plaintiffs other listed contacts.  *See Quick Technologies,* 313 F.3d at 345 (operating a website containing company and product information and links to U.S. subsidiaries does not provide sufficient grounds for the exercise of personal jurisdiction).  To that end, Plaintiffs again contend that Southern Sales' maintenance of a website supports finding general jurisdiction.  As stated in Section III and IV of this order, a passive website, like Southern Sales' website, is insufficient to confer general jurisdiction.  *Mink,* 190 F.3d at

- 26 -

337.

Plaintiffs also assert that Southern Sales' practice of obtaining supplies from the United States for the yachts it manages supports finding general jurisdiction.   As Southern Sales notes, Plaintiffs have not presented the court with evidence showing the regularity or volume of such purchases.   In fact, purchases from the forum even if occurring at regular intervals are insufficient to confer general jurisdiction over Southern Sales.   *Helicopteros,* 466 U.S. at 418; *see also Submersible Systems,* 249 F.3d at 420-21.

Plaintiffs further contend that Southern Sales has brokered "numerous" sales of yachts owned by United States entities in an attempt to establish general jurisdiction. In support of this contention, Plaintiffs point to the fact that Southern Sales makes daily calls to the United States and a Southern Sales representative has traveled to the United States at least once to effectuate a sale.   Regular contact with forum is not enough to establish general jurisdiction over Southern Sales.   *Revell,* 317 F.3d at 471 ("repeated contacts with the forum by a foreign defendant may not constitute the requisite substantial, continuous, and systematic contacts required for a finding of general jurisdiction–in other words, while it may be doing business *with* [the forum], it is not doing business *in* [the forum]")(emphasis in original).   The exchange of communications between a resident and nonresident in the course of developing a contract is not sufficient to establish jurisdiction.   *Holt,* 801 F.2d at 778.   Plaintiffs can only affirmatively state that a Southern Sales representative has traveled to the United States once to effectuate a sale.   One trip to the United States to effectuate a sale is far from

being sufficient to meet the continuous and systematic test. *Helicopteros,* 466 U.S. at 417; *Submersible Systems,* 249 F.3d at 420-21. Because Southern Sales does not do business *in* the forum and a representative has only traveled to the United States once, Southern Sales lacks sufficient contacts with the United States to confer general jurisdiction. *Revell,* 317 F.3d at 471.

Plaintiffs contend that Southern Sales maintains "close ties" with CharterPort supports finding general jurisdiction because CharterPort has continuous and systematic contacts with the United States. Although Plaintiffs provide no legal authority, the Court presumes that they are arguing under an alter ego theory that CharterPort's contacts should be imputed upon Southern Sales. As set forth in Section III of this Order, CharterPort lacks contacts sufficient with Texas or the United States to establish specific or general jurisdiction. Even if the Court imputed CharterPort's contacts upon Southern Sales under an alter ego theory, Plaintiffs would still fail to establish general jurisdiction over Southern Sales because CharterPort lacks sufficient contacts with the forum and the United States. Likewise, the fact that Carson, Southern Sales' director and operator, is a United States citizen does not support finding general jurisdiction. The focus of the jurisdictional inquiry remains on the entity itself particularly in this case where Carson has not lived in the United States since 1992. *American Eyewear,* 205 F.3d at 219.

Southern Sales lacks sufficient contact with the United States to confer general jurisdiction under Rule 4(k)(2) for these reasons:

- 28 -

- Southern Sales is a corporation organized and existing under the laws of the BVI with its principal place of business in Road Town, Tortola, BVI.

- It does not maintain a place of business in the United States and has never been a resident of the United States.

- Southern Sales has never owned or leased property in the United States nor has it ever employed anyone in the United States.

- Southern Sales has never registered with the secretary of any state and has never paid or been required to pay income or property taxes in the United States.

- Southern Sales has no bank accounts in the United States nor has it sued or been sued in the United States.

Southern Sales merely acted as a broker for the sale of the Arabesque in 2002 and managed its financial affairs for six months thereafter.  In light of well established case law, Plaintiffs list of contacts with the forum, even when considered collectively, are not continuous and systematic such that they create a substantial connection to Texas or the United States for that matter.  *Burger King,* 471 U.S. at 475.  The Court may not exercise general personal jurisdiction over Southern Sales.

## VI.   Conclusion

The Court **GRANTS** Plaintiffs' Motion for Leave to file Sur-Reply; therefore, the attached Sur-Reply is deemed filed as of this date.  Defendants lack sufficient minimum contacts with this forum and the United States, as a whole, for this Court to exercise general or specific personal jurisdiction over them.  Therefore, the Court **GRANTS** Defendants' motions to dismiss for lack of personal jurisdiction, and all claims against Defendants are dismissed without prejudice.  Pursuant to the Court's Order dated

December 4, 2006, Southern Charters is hereby **DISMISSED** without prejudice from this case for failure to prosecute.  Plaintiffs' Motions for Leave to Take the Deposition of Rainbow Yacht and to Enlarge Time are **DENIED** as moot.  A Final Judgment will be entered separately.

       **SO ORDERED.**

       Signed February 7th, 2007.

ED KINKEADE
UNITED STATES DISTRICT JUDGE